## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,     )
                         )
           Plaintiff,      )
                         )
vs.                       )
                         )
FRANK SMITH,          )     Case No. 21-CR-30003-DWD
WARREN GRIFFIN,       )
ANTHONY DOBBINS,     )
SEAN CLEMON,         )
DOMINIQUE MAXWELL,   )
PERRY HARRIS, and     )
BARRY BOYCE,         )
                         )
           Defendants.    )

## MEMORANDUM & ORDER

Before the Court is Defendant Maxwell's Motion to Suppress ("Motion") (Doc. 447) items seized during a vehicle search. The Government filed a Response in Opposition to the Motion (Doc. 547). The Court has held an evidentiary hearing on the Motion and is now prepared to rule. For the following reasons, the Motion is **DENIED**.

## I. Background

A grand jury in the Southern District of Illinois originally returned a 13-count Indictment (Doc. 1) against Defendant and six co-Defendants. A 13-count Superseding Indictment (Doc. 671) was subsequently returned against Defendant and four co-Defendants, alleging a racketeering conspiracy in violation of 18 U.S.C. § 1962(d) and 1963(a) (Count 1). (Doc. 671). Defendant was also charged with murder in aid of racketeering under 18 U.S.C. § 1959(a)(1) and Section 2 (Count 2), use of a firearm during and in relation to a crime of violence under 18 U.S.C. § 924(C)(1)(A) and Section

2 (Counts 3, 6, 8, & 10), use of a firearm during and in relation to a crime of violence causing death under 18 U.S.C. § 924(j)(1) and Section 2 (Count 4), and attempted murder in aid of racketeering under 18 U.S.C. § 1959(a)(5) and Section 2 (Counts 5, 7, & 9). (Doc. 671).

## A. The Traffic Stop, "Dog Sniff," and Vehicle Search

On November 23, 2019, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") allegedly learned of a threat of violence to a confidential informant ("CI"). (Doc. 447, pg. 1). Special Agent Timothy Miller and another Special Agent met with the CI, who was able to assure the Special Agents that he or she was not in danger. (Doc. 447, pg. 1). That same day, the CI made a recorded phone call to Defendant, who allegedly indicated he was in Cape Girardeau, Missouri, and intended to harm an unidentified individual. (Docs. 447, pg. 1; 547, pg. 1). Defendant had allegedly been drinking. (Doc. 547, pg. 1)

ATF agents and Task Force Officers then sought and eventually located Defendant driving his vehicle in Cape Girardeau. (Docs. 447, pgs. 1-2; 547, pgs. 1-2). ATF agents observed Defendant fail to use his turn signal and relayed that information to officers of the Cape Girardeau Police Department, who initiated a traffic stop. (Doc. 447, pg. 2; 547, pgs. 2, 5). Defendant denied he had been drinking; nevertheless, he was ordered out of the vehicle to complete a sobriety test. (Docs. 447, pg. 2; 547, pg. 3). The results of the sobriety test were negative; however, by this time, a canine arrived on scene and thereafter alerted to the vehicle. (Docs. 447, pg. 2; 547, pg. 3). A subsequent search of the vehicle resulted in the officer finding a 9mm Ruger handgun in the glove

compartment of the vehicle. (Docs. 447, pg. 2; 547, pg. 3). Ballistic testing revealed that the handgun, and one of the two handguns obtained from the other passengers, was used in two shootings investigated by ATF. (Doc. 547, pgs. 2, 4).

## B. Defendant's Motion

Now, Defendant argues he was subjected to an unlawful traffic stop and arrest by officers who did not have a reasonable suspicion of wrongdoing. (Doc. 447, pg. 3). By extension, Defendant argues he was subjected to an unlawful vehicle search. (Doc. 447, pg. 3). Defendant notes it was ATF agents who observed the alleged traffic infraction, yet local law enforcement conducted the traffic stop. (Doc. 447, pgs. 4-5, 7). Defendant further notes no officer smelled alcohol or drugs during the traffic stop. (Doc. 447, pgs. 5, 7). As such, Defendant argues he was unlawfully seized. (Doc. 447, pgs. 3-5). Defendant also argues the "dog sniff" occurred during the unlawful seizure, and the vehicle search occurred due to the "dog sniff." (Doc. 447, pgs. 6, 9). Defendant points out that the "dog sniff" was not logged in the canine's service record. (Docs. 641 & 641-1). For these reasons, Defendant argues the Court must suppress all evidence taken from his vehicle, presumably the handgun retrieved from the glove compartment. (Doc. 447, pgs. 9-10).[1]

In response, the Government argues the traffic stop was permissible due to Defendant's traffic violation, *i.e.*, the failure to use a turn signal, and the information collectively known to the officers and agents. (Doc. 547, pgs. 4-5). The Government

---

[1] In the Motion, Defendant does not argue any evidence must be suppressed due to circumstances of the traffic stop occurring after the completion of the vehicle search and seizure of the gun.

notes the officers of the Cape Girardeau Police Department acted in reliance on the information provided by ATF and Task Force Officers, who witnessed the traffic violation, and each law enforcement agency would have similarly conducted the traffic stop. (Doc. 547, pg. 5). Likewise, the Government notes, that even absent Defendant's traffic violation, the traffic stop was justified by the information provided to ATF by the CI. (Doc. 547, pg. 6).

Further, the Government argues Defendant was subjected to a lawful seizure, not an arrest. (Doc. 547, pgs. 4, 7). It again notes the collective knowledge of the officers and agents, which justified the seizure. (Doc. 547, pg. 8). The Government also argues the seizure was reasonable in length and permitted the "dog sniff." (Doc. 547, pgs. 8, 10). The Government posits, "the dog sniff occurred while conducting ordinary inquiries incident to the stop, such as running the occupants' identifications for warrants." (Doc. 547, pg. 8). The Government states "approximately three minutes had elapsed from the time officers began running the identifications of the three occupants for warrants and when the K-9 unit arrived." (Doc. 547, pg. 10). At that time, Defendant was completing a sobriety test. (Doc. 547, pg. 10). For similar reasons, the Government asserts the "dog sniff" did not prolong the traffic stop. (Doc. 547, pgs. 8-9). Regardless, the Government argues a reasonable suspicion allowed the officers to extend the traffic stop for a "dog sniff." (Doc. 547, pgs. 10-11). Once the canine alerted to the vehicle, the Government argues the officers had probable cause to search the entire vehicle. (Doc. 547, pgs. 11-12).

### C. Evidentiary Hearing on Defendant's Motion

On November 15, 2022, the Court held an evidentiary hearing on the Motion, at which time the Court received testimony from ATF Special Agent Timothy Miller, former Cape Girardeau Police Department and ATF Task Force Officer Brian Eggers, Cape Girardeau Police Department Officer Joseph Hellmann, and former Cape Girardeau Police Department Officer Gabriel Yoder. Certain body camera footage of the officers was admitted without objection at the hearing.[2] (Tr. at Doc. 635, pgs. 33-34, 121-22, 129-30). The Court has reviewed each exhibit. The hearing evidence is summarized below.

### 1. ATF Special Agent Timothy Miller

Special Agent Miller has investigated the Gangster Disciples in Missouri and Illinois. (Tr. at Doc. 635, pg. 40). He testified about two separate shootings, allegedly involving members of the Gangster Disciples, that occurred in Bridgeton, Missouri, on April 28, 2018, and Cape Girardeau, Missouri, on June 3, 2018. (Tr. at Doc. 635, pgs. 39-43). Defendant, among others, was identified as being involved in each of the shootings. (Tr. at Doc. 635, pgs. 42-44). Further, Special Agent Miller testified that at least one of the same guns was used in each of the shootings. (Tr. at Doc. 635, pg. 44).

On November 23, 2019, Special Agent Miller met with a CI involved in the investigation of the Gangster Disciples. (Tr. at Doc. 635, pgs. 47-50). Special Agent

---

[2]Government's Exhibit 1 contains the body camera footage of former Cape Girardeau Police Department Officer Gabriel Yoder, who is a canine handler. (Doc. 610). Defendant's Exhibit A contains the body camera footage of Cape Girardeau Police Department Officers Joseph Hellmann and Shane Bourbon. (Doc. 614). Defendant's Exhibit A also includes the body camera footage of an officer with the designation "guest." (Doc. 614). The exhibits containing body camera footage, which were admitted without objection at the hearing, were manually filed with the Court. (Docs. 610; 614; 635, pgs. 33-34, 121-22).

Miller was working to subdue a threat of violence against the CI. (Tr. at Doc. 635, pg. 50). Special Agent Miller had the CI make a recorded phone call to Defendant. (Tr. at Doc. 635, pg. 50). During that phone call, which Special Agent Miller overheard in real time, Defendant indicated he was in Cape Girardeau and had been drinking. (Tr. at Doc. 635, pgs. 51-52). Special Agent Miller testified that Defendant was having a problem with an unidentified person that he "was going to slide up on" with "some of the guys." (Tr. at Doc. 635, pg. 52). Defendant "stated clearly" that he was going to initiate a confrontation or fight with the unidentified person. (Tr. at Doc. 635, pg. 52). Special Agent Miller testified that Defendant said he was not "going to be on any shooting," but indicated that he might stab or use a baseball bat against the unidentified person. (Tr. at Doc. 635, pgs. 53-54, 66).

After hearing these threats, Special Agent Miller traveled to Cape Girardeau, where he intended to intervene before any violence occurred. (Tr. at Doc. 635, pgs. 54-55). Law enforcement began searching Cape Girardeau for Defendant. (Tr. at Doc. 635, pgs. 55-56). Special Agent Miller testified that, in the early morning of November 24, 2019, patrol officers interacted with Defendant and two passengers of his vehicle during a traffic stop. (Tr. at Doc. 635, pg. 56). Special Agent Miller went to the scene of, but did not actually participate in, the traffic stop. (Tr. at Doc. 635, pgs. 56-57). However, Special Agent Miller indicated that he "probably would have conveyed [a] preference that [the officers] be able to search the car." (Tr. at Doc. 635, pg. 67). Special Agent Miller further indicated that he would have relayed the information known to him at the time to

Officer Eggers, namely, the threats of violence and the mutual public safety interest in stopping the car and making contact with Defendant. (Tr. at Doc. 635, pgs. 67-68).

Three guns were recovered by the officers during the traffic stop. (Tr. at Doc. 635, pg. 57). A gun was recovered from the waistband of each passenger of the vehicle. (Tr. at Doc. 635, pg. 58). The third gun was recovered during a subsequent search of the glove compartment of the vehicle. (Tr. at Doc. 635, pg. 58). Special Agent Miller testified that one of the guns recovered from the passengers was subsequently determined to be a gun fired at the Bridgeton and Cape Girardeau shootings. (Tr. at Doc. 635, pg. 59). Likewise, Special Agent Miller testified that the bullet removed from the homicide victim at the Bridgeton shooting was fired from the gun recovered from the locked glove compartment of the vehicle. (Tr. at Doc. 635, pg. 59). At the traffic stop, Special Agent Miller understood Defendant, a convicted felon, could not possess a firearm. (Tr. at Doc. 635, pg. 61).

### 2. Former Cape Girardeau Police Department Officer Brian Eggers

As of November 23 and 24, 2019, Officer Eggers worked as a Cape Girardeau Police Department and ATF Task Force Officer. (Tr. at Doc. 635, pg. 75). In those roles, he worked on the investigation into the Illinois and Missouri Gangster Disciples. (Tr. at Doc. 635, pg. 76). Therefore, Officer Eggers knew, in November 2019, that Defendant was a suspect in the Bridgeton and Cape Girardeau shootings. (Tr. at Doc. 635, pgs. 76-77).

On November 23, 2019, Officer Eggers was informed by Special Agent Miller that Defendant "was planning on assaulting or killing somebody." (Tr. at Doc. 635, pg. 78). As a result, he went to Cape Girardeau to search for Defendant's vehicle. (Tr. at Doc. 635, pg. 78). Officer Eggers was in an unmarked police car, wearing plain clothes. (Tr. at Doc. 635, pgs. 79-80). Officer Eggers notified marked units of the Cape Girardeau Police Department of the threats and vehicle description. (Tr. at Doc. 635, pgs. 80, 84).

Officer Eggers eventually located Defendant's vehicle near the intersection of Pinwood and Whitener in Cape Girardeau. (Tr. at Doc. 635, pgs. 80-81). Officer Eggers observed Defendant and a Co-Defendant get into the vehicle while it was parked on a lot on Whitener. (Tr. at Doc. 635, pg. 81). Defendant sat in the driver's seat. (Tr. at Doc. 635, pg. 81). Defendant pulled out of the parking lot onto Whitener and drove toward Pinwood. (Tr. at Doc. 635, pg. 81). When Defendant turned onto Pinwood, Officer Eggers, who was behind Defendant's vehicle, observed a turn signal violation. (Tr. at Doc. 635, pgs. 81, 85-86). Officer Eggers did not effectuate a traffic stop because he was in an unmarked police car. (Tr. at Doc. 635, pg. 82). Officer Eggers followed the vehicle and informed marked units of the turn signal violation. (Tr. at Doc. 635, pgs. 81-82).

Officer Eggers observed Officer Joseph Hellmann of the Cape Girardeau Police Department effectuate the traffic stop. (Tr. at Doc. 635, pg. 82). Officer Eggers testified that Defendant did not immediately pull to the roadside after Officer Hellmann initiated the traffic stop. (Tr. at Doc. 635, pg. 82). Defendant "s[l]owed down and then at one point stopped[,] and then continued around the turn southbound onto Kingshighway[,] and probably slow rolled and stopped for 30 seconds before he

continued onto Kingshighway and then stopped…on Kingshighway." (Tr. at Doc. 635, pg. 82). Officer Eggers was at the scene of, but did not participate in, the traffic stop. (Tr. at Doc. 635, pgs. 83-84).

### 3. Cape Girardeau Police Department Officer Joseph Hellmann

Officer Hellmann was informed by Officer Shane Bourbon, who was in contact with ATF, that Defendant "and a couple other individuals were going to be coming up into Cape [Girardeau] to possibly harm somebody." (Tr. at Doc. 635, pgs. 89, 91). For that reason, Officer Hellmann testified that the officers were looking for Defendant's vehicle in Cape Girardeau. (Tr. at Doc. 635, pg. 89). Officer Hellmann was eventually informed that Defendant's vehicle was located by Officer Eggers. (Tr. at Doc. 635, pg. 92). Officer Eggers advised that he observed Defendant commit a turn signal violation. (Tr. at Doc. 635, pg. 92). Officer Hellmann stated Officer Eggers requested his assistance because Officer Hellmann was in a marked police car. (Tr. at Doc. 635, pg. 93). Officer Eggers described the vehicle and where it was traveling. (Tr. at Doc. 635, pg. 93). Officer Hellmann drove to the area and, at 12:01 a.m. on November 24, 2019, initiated a traffic stop of the vehicle. (Tr. at Doc. 635, pgs. 89, 93, 95). Officer Bourbon was "right behind" Officer Hellmann when the traffic stop was initiated. (Tr. at Doc. 635, pg. 93).

Defendant did not immediately stop his vehicle. (Tr. at Doc. 635, pg. 93). Officer Hellmann testified, "the vehicle slowed down in the roadway, kind of like he was going to pull over[,] and then kind of paused in the roadway near Kingshighway and Independence…and then it continued driving eastbound and eventually turned south

onto Kingshighway." (Tr. at Doc. 635, pg. 94). Officer Hellmann continued, "it never felt like he was fleeing…. It wasn't like he was accelerating, but it was odd how long it took to stop." (Tr. at Doc. 635, pg. 94). Once Defendant stopped, Officer Hellmann and Officer Bourbon approached the passenger's side of the vehicle. (Tr. at Doc. 635, pg. 94); (Defendant's Exhibit A, "Hellmann Body Camera," :40, "Bourbon Body Camera," :56).

Officer Hellmann stated Officer Bourbon made contact with the occupants of the vehicle through the front passenger's side window. (Tr. at Doc. 635, pg. 94); (Defendant's Exhibit A, "Hellmann Body Camera," :46, "Bourbon Body Camera," 1:03). Defendant was in the driver's seat. (Tr. at Doc. 635, pg. 95). Officer Bourbon indicated Defendant failed to use a turn signal, then obtained the occupants' drivers' licenses or other forms of identification and returned to his police car. (Tr. at Doc. 635, pgs. 94, 96); (Defendant's Exhibit A, "Hellmann Body Camera," :54 to 1:28, "Bourbon Body Camera," 1:06 to 1:45). Officer Hellmann was at the rear of the vehicle providing cover to Officer Bourbon. (Tr. at Doc. 635, pgs. 94, 96); (Defendant's Exhibit A, "Hellmann Body Camera," 1:30). Approximately four minutes into the traffic stop, *i.e.*, at 12:05 a.m., Officer Hellmann requested that a canine officer report to the scene. (Tr. at Doc. 635, pg. 96). Officer Hellmann testified, "we had information that [Defendant] was coming here to cause harm to somebody. I wanted to search that car to find [out] if there were weapons in that vehicle, that is the tool we use, a canine sniff." (Tr. at Doc. 635, pgs. 96, 104, 107, 112).

Officer Bourbon exited his police car and then requested that Officer Hellmann seek consent to search the vehicle and determine whether Defendant had an odor of

alcohol on his breath. (Tr. at Doc. 635, pg. 97); (Defendant's Exhibit A, "Hellmann Body Camera," 8:12, "Bourbon Body Camera," 8:27). Officer Hellmann then asked Defendant if he had been drinking and ordered him out of the vehicle. (Tr. at Doc. 635, pg. 97); (Defendant's Exhibit A, "Hellmann Body Camera," 9:14). Officer Hellmann took this action because, in his experience, midnight is "prime time for drunk drivers" and Defendant took "roughly 25 to 30 seconds to stop his vehicle." (Tr. at Doc. 635, pgs. 97, 105). Officer Hellmann indicated the latter justification occurs when a driver is "hid[ing] contraband," such as weapons or drugs, or is impaired. (Tr. at Doc. 635, pgs. 97-98). Further, Officer Hellmann testified, with Defendant outside of the vehicle, he could better detect an odor of alcohol. (Tr. at Doc. 635, pgs. 98-99). Outside the vehicle, Officer Hellmann requested that Defendant, who denied drinking alcohol, perform "roadside exercises." (Tr. at Doc. 635, pgs. 98, 107); (Defendant's Exhibit A, "Hellmann Body Camera," 9:17). Officer Hellmann administered a horizontal gaze and nystagmus test, which showed no signs of impairment. (Tr. at Doc. 635, pg. 99); (Defendant's Exhibit A, "Hellmann Body Camera," 10:05). As a result, Officer Hellmann ended the test early. (Tr. at Doc. 635, pg. 99); (Defendant's Exhibit A, "Hellmann Body Camera," 10:43). He never detected drugs or alcohol. (Tr. at Doc. 635, pgs. 105, 110). Officer Hellmann testified that, before and during the "roadside exercises," Officer Bourbon was looking for an "E ticket device" to issue a citation for the turn signal violation. (Tr. at Doc. 635, pg. 100); (Defendant's Exhibit A, "Hellmann Body Camera," 8:31, "Bourbon Body Camera," 8:47).

The canine officer, Officer Gabriel Yoder of the Cape Girardeau Police Department, arrived at 12:08 a.m., *i.e.*, approximately 7 minutes after the initiation of the traffic stop and 3 minutes after the request of Officer Hellmann. (Tr. at Doc. 635, pgs. 97, 99-100). Officer Yoder arrived before Defendant was ordered out of the vehicle for "roadside exercises." (Tr. at Doc. 635, pg. 99). After the completion of those "roadside exercises," Officer Yoder conducted a "dog sniff" of the vehicle. (Tr. at Doc. 635, pg. 100). Before doing so, Officer Yoder advised that "he wanted the occupants out of the vehicle." (Tr. at Doc. 635, pg. 100); (Defendant's Exhibit A, "Hellmann Body Camera," 11:08). Officer Hellmann ordered each passenger out of the vehicle, at which time each passenger informed Officer Hellmann that he was carrying a firearm. (Tr. at Doc. 635, pg. 101); (Defendant's Exhibit A, "Hellmann Body Camera," 11:33, 12:58). Officer Hellmann seized each firearm. (Tr. at Doc. 635, pgs. 101-102). During the "dog sniff," Officer Hellmann was providing cover and watching the passengers. (Tr. at Doc. 635, pg. 101).

Officer Hellmann was informed by Officer Yoder that the canine alerted to the vehicle. (Tr. at Doc. 635, pg. 102); (Defendant's Exhibit A, "Hellmann Body Camera," 14:53). Officer Hellmann then searched the vehicle. (Defendant's Exhibit A, "Hellmann Body Camera," 16:00 to 26:30). In the center console or cupholder, Officer Hellmann found a set of keys. (Tr. at Doc. 635, pg. 102). Officer Hellmann used the keys to unlock the glove compartment, where he found a Ruger 9mm handgun. (Tr. at Doc. 635, pg. 102). Officer Hellmann seized the handgun. (Tr. at Doc. 635, pg. 102). Officer Hellmann

also found a baseball bat, but no drugs, in the vehicle. (Tr. at Doc. 635, pg. 102). None of the three occupants were arrested as a result of the traffic stop. (Tr. at Doc. 635, pg. 102).

### 4. Former Cape Girardeau Police Department Officer Gabriel Yoder

On November 23 and 24, 2019, Officer Yoder was a patrolman and canine handler at the Cape Girardeau Police Department. (Tr. at Doc. 635, pg. 114). To serve as a canine handler, Officer Yoder was required to pass an interview process and attend eight weeks of full-time training with certified canine trainers. (Tr. at Doc. 635, pgs. 114-15). Then, for the life of the canine, Officer Yoder was required to participate in a minimum of 16 hours of training per month. (Tr. at Doc. 635, pg. 114). At the time of the traffic stop at issue, Officer Yoder was working with "Debo." (Tr. at Doc. 635, pg. 115). Officer Yoder described the search of a vehicle or other compartment by a canine as follows:

> They're smelling for narcotics. Debo was trained to detect methamphetamine, heroin, cocaine and marijuana. And then what we're looking for is…a change of behavior. The tension in their bodies, their breathing pattern, their focus[,] and then our dogs are trained to come to a final passive response[,] where if they can pinpoint where the source of the odor is coming from they will sit and stare.

(Tr. at Doc. 635, pgs. 115-16).

Officer Yoder testified that it was common to be called to a traffic stop for "canine sniffs." (Tr. at Doc. 635, pg. 117). Officer Yoder was called to this traffic stop by Officer Hellmann. (Tr. at Doc. 635, pg. 116). He arrived at 12:08 a.m. (Tr. at Doc. 635, pgs. 117-18). Consistent with policy and officer safety, the passengers were removed from the vehicle for the "dog sniff." (Tr. at Doc. 635, pg. 118); (Government's Exhibit 1,

5:17 to 5:35). Once the passengers were out of the vehicle, Officer Yoder began the "dog

sniff." (Tr. at Doc. 635, pg. 118); (Government's Exhibit 1, 8:00). He described the "dog

sniff" as follows:

> I started [Debo] at the front of the vehicle, gave him the commands to
> locate narcotics, which is "find it," ran him around the front past the
> driver and passenger doors. He came around the front, passed the driver
> and passenger doors at the rear of the vehicle. It appeared that he picked
> up odor, threw his head up, worked his way back up to the front of the
> car and immediately worked the odor into the front driver window and
> jumped up into the window and was sniffing and indicating that he
> was…smelling narcotics. I tapped him off the vehicle to prevent him from
> scratching it and he came to a final response and sat and stared.

(Tr. at Doc. 635, pgs. 118-19); (Government's Exhibit 1, 8:00 to 8:46).

Officer Yoder emphasized that Debo sat and alerted to where the smell of narcotics

was coming from, namely, the front driver's side window. (Tr. at Doc. 635,

pgs. 119-20). He then informed Officer Hellmann of the alert and conversed with

Defendant. (Tr. at Doc. 635, pg. 120); (Government's Exhibit 1, 8:55 to 9:01). Defendant

indicated he does not smoke marijuana; however, earlier in the night, he might have

been around people who smoke marijuana. (Tr. at Doc. 635, pg. 120); (Government's

Exhibit 1, 9:01).

On cross-examination, Officer Yoder clarified that Debo is certified to find

narcotics, including residual odor and the "actual source," but not guns. (Tr. at Doc.

635, pgs. 123-24). Officer Yoder was not aware of drugs being found in the vehicle. (Tr.

at Doc. 635, pg. 124). Officer Yoder indicated that he recorded an "unverified alert" in

Debo's service record. (Tr. at Doc. 635, pg. 125). However, Debo's Service Record (Doc.

641-1), which was filed as an attachment to Defendant's Supplement to the Motion to

Suppress (Doc. 641), contains no entries related to Defendant on November 23 or 24, 2019.

## II. Analysis

Initially, the collective knowledge doctrine allows an officer to stop, search, or arrest a suspect at the direction of another officer or agency, even if the officer does not have firsthand knowledge of the facts amounting to the necessary level of suspicion for the action. *See U.S. v. William*s, 627 F.3d 247, 252 (7th Cir. 2010) (citing *U.S. v. Hensley*, 469 U.S. 221, 232-33 (1985)). If the knowledge of the officer directing the stop, search, or arrest (or the knowledge of the agency for which he or she works) establishes the requisite suspicion, then there is no violation of the Fourth Amendment. *See id.* (citing *U.S. v. Harris*, 585 F.3d 394, 400 (7th Cir. 2009)); *accord U.S. v. Sands*, 815 F.3d 1057, 1062 (7th Cir. 2015); *see also U.S. v. Street*, 917 F.3d 586, 598 (7th Cir. 2019) ("When more than one police officer is involved in the reasonable-suspicion analysis, courts consider their collective knowledge."). The collective knowledge doctrine applies if the following requirements are satisfied: (1) the responding officer is acting in objective reliance on the information received; (2) the officer or agency providing the information to the responding officer has facts supporting the required level of suspicion; and (3) the stop is no more intrusive than would be permissible for the requesting officer or agency. *See William*s, 627 F.3d at 252-53 (citing *U.S. v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992)); *accord Sands*, 815 F.3d at 1062.

Further, the "ultimate touchstone" of the Fourth Amendment is reasonableness, in objective terms, under the totality of the circumstances. *See United States v. Yang*, 39 F.

4th 893, 899 (7th Cir. 2022) (quoting *United States v. Price*, 28 F.4th 739, 748 (7th Cir. 2022); *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2022)). Since traffic stops are seizures, they must be reasonable. *See id.* (citing *Cole*, 21 F.4th at 427); *accord U.S. v. Rodriguez-Escalera*, 884 F.3d 661, 667 (7th Cir. 2018). To be reasonable, a traffic stop must be justified at its inception and reasonably related in scope to the circumstances of the initial interference. *See Cole*, 21 F.4th at 427 (quoting *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt County*, 542 U.S. 177, 185 (2004)). "[R]outine traffic stop[s]," as more akin to *Terry* stops than arrests, require a reasonable suspicion of wrongdoing and not probable cause. *See Yang*, 39 F. 4th at 899 (quoting *Rodriguez v. U.S.*, 575 U.S. 348, 354 (2015)); *Cole*, 21 F.4th at 427; *Terry v. Ohio*, 392 U.S. 1 (1968). The "officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion.' [Citation]." *See Yang*, 39 F. 4th at 899 (quoting *Rodriguez-Escalera*, 884 F.3d at 668); *accord U.S. v. Lewis*, 920 F.3d 483, 493 (7th Cir. 2019). Factors for a reasonable suspicion may be discussed separately, but the Court "must still 'consider the reasonable inferences that a law enforcement officer could draw from the objective facts in combination' rather than 'examin[ing] each factor…in isolation.' [Citation]." *See Yang*, 39 F. 4th at 899 (quoting *Rodriguez-Escalera*, 884 F.3d at 668).

Field sobriety tests may be administered during a traffic stop if the officer has a reasonable and articulable suspicion that the motorist is intoxicated. *See Bernardi v. Klein*, 682 F. Supp. 2d 894, 902 (W.D. Wisc. 2010); *see also Dean v. City of Chicago*, 896 F. Supp. 2d 699, 706 (N.D. Ill. 2012); *Best v. Berard*, 837 F. Supp. 2d 933, 940 (N.D. Ill. 2011).

However, a "dog sniff" of a vehicle for drugs, during a lawful traffic stop, comports with the Fourth Amendment even absent a reasonable suspicion of drugs. *See United States v. Simon*, 397 F.3d 820, 831-32 (7th Cir. 2019) (citing *Illinois v. Caballes*, 543 U.S. 405, 410 (2005)); *accord Lewis*, 920 F.3d at 491. The lawful stop, justified by a traffic violation, violates the Fourth Amendment only if it is prolonged "beyond the time reasonably required to complete…[its] original mission." *See Simon*, 397 F.3d at 832 (citing *Rodriguez*, 575 U.S. at 349); *accord Lewis*, 920 F.3d at 491. Put another way, an officer may conduct unrelated checks during a traffic stop, including a "dog sniff," but cannot prolong the traffic stop for those checks absent "the reasonable suspicion ordinarily demanded to justify detaining an individual." *See Simon*, 397 F.3d at 832 (citing *Lewis*, 920 F.3d at 491); *see also Cole*, 21 F.4th at 427 (stating a detour from the mission of a traffic stop, which prolongs the traffic stop to investigate other criminal activity, violates the Fourth Amendment absent a reasonable suspicion that independently justifies prolonging the stop).

The alert of "an adequately trained and reliable dog" establishes probable cause to search a vehicle. *See U.S. v. Bentley*, 795 F.3d 630, 635 (7th Cir. 2015) (citing *U.S. v. Washburn*, 383 F.3d 638, 643 (7th Cir. 2004)). The Seventh Circuit has acknowledged:

> If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

*Simon*, 397 F.3d at 833-34 (quoting *Florida v. Harris*, 568 U.S. 237, 246-47 (2013)). "The ultimate question is 'whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime….' [Citation]." *Id*. at 834 (quoting *Harris*, 568 U.S. at 248). Since "the search can go as far as probable cause extends, even into separate containers or the trunk of the car," a dog's alert establishes probable cause to search the vehicle's glove compartment and containers. *See U.S. v. Franklin*, 547 F.3d 726, 735 (7th Cir. 2008) (citing *U.S. v. Ledford*, 218 F.3d 684, 688 (7th Cir. 2000)); *accord Simon*, 397 F.3d at 833 ("A dog's alert on a car can give probable cause to search the entire car. Indeed, a good dog's alert can provide a rebuttable presumption of probable cause."). If a search or seizure violates the Fourth Amendment, then a court will generally exclude the evidence resulting from that search or seizure. *See Lewis*, 920 F.3d at 489 (citing *U.S. v. Wilbourn*, 799 F.3d 900, 910 (7th Cir. 2015)); *Rodriguez-Escalera*, 884 F.3d at 667.

Here, the special agents and officers involved were undoubtedly acting pursuant to collective knowledge, *i.e.*, the collective knowledge that Defendant was in Cape Girardeau to possibly harm an unidentified person. Special Agent Miller testified that he heard this information, in real time, during a recorded phone call between Defendant and the CI. (Tr. at Doc. 635, pgs. 50-52). Defendant "stated clearly" that he was going to initiate a confrontation or fight with the unidentified person. (Tr. at Doc. 635, pg. 52). It was due to these threats that Special Agent Miller, intending to intervene in the situation, traveled to Cape Girardeau, where law enforcement was beginning to

search for Defendant. (Tr. at Doc. 635, pgs. 54-56). Notably, Special Agent Miller also overheard that Defendant was drinking on the evening of November 23, 2019. (Tr. at Doc. 635, pgs. 51-52).

Critically, Special Agent Miller relayed what he knew to Officer Eggers, who worked as an officer for the Cape Girardeau Police Department and ATF. (Tr. at Doc. 635, pgs. 67-68, 75, 78). Officer Eggers relayed the threats of violence, as well as Defendant's vehicle description and turn signal violation, to marked units of the Cape Girardeau Police Department. (Tr. at Doc. 635, pgs. 80, 81-82, 84, 92). Officer Hellmann, who was also advised of Defendant's threats of violence by Officer Bourbon, responded to that request for assistance. (Tr. at Doc. 635, pgs. 82, 89, 91-93). Thus, at the time of the traffic stop, Officers Hellmann and Bourbon acted with the collective knowledge that Defendant committed a turn signal violation and made threats of violence. (Tr. at Doc. 635, pgs. 89, 93-96); (Defendant's Exhibit A, "Bourbon Body Camera," 1:06). For these reasons, the Court **FINDS** Officer Hellmann, at a minimum, had a reasonable suspicion of wrongdoing sufficient to stop the vehicle. *See Williams*, 627 F.3d at 252-53; *Sands*, 815 F.3d at 1062; *Street*, 917 F.3d at 598; *Yang*, 39 F. 4th at 899; *see also U.S. v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) ("Probable cause exists when 'the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense.' [Citation]."); *accord U.S. v. Taylor*, 596 F.3d 373, 376 (7th Cir. 2010); *Lewis*, 920 F.3d at 489.

Aside from the collective knowledge of the turn signal violation and threats of violence, the Court **FINDS** Officer Hellmann had a reasonable suspicion of insobriety

that was sufficient to require Defendant to complete "roadside exercises." *See Bernardi*, 682 F. Supp. 2d at 902; *Dean*, 896 F. Supp. 2d at 706; *Best*, 837 F. Supp. 2d at 940. Consistent with the testimony of Officer Eggers, Officer Hellmann testified that Defendant failed to immediately stop his vehicle. (Tr. at Doc. 635, pgs. 82, 93-94). Based on his experience, failures to stop occur when a driver is "hid[ing] contraband" or is impaired. (Tr. at Doc. 635, pgs. 97-98). Further, midnight is "prime time for drunk drivers." (Tr. at Doc. 635, pgs. 97, 105). The Court notes, prior to asking Defendant if he had been drinking and ordering him out of the vehicle for "roadside exercises," Officer Hellmann was not positioned to independently detect odors of alcohol or otherwise assess Defendant's sobriety. (Defendant's Exhibit A, "Hellmann Body Camera," 8:12). Officer Hellmann said, outside the vehicle, he could better detect odors of alcohol. (Tr. at Doc. 635, pgs. 98-99).

Further, the Court **FINDS** the "dog sniff" did not prolong the traffic stop beyond the time reasonably required to complete its mission. *See Simon*, 397 F.3d at 831-32; *Lewis*, 920 F.3d at 491. Officer Yoder arrived on scene prior to Defendant's removal from the vehicle for the "roadside exercises." (Tr. at Doc. 635, pg. 99). This was approximately 7 minutes after the initiation of the traffic stop and 3 minutes after he was called to the scene. (Tr. at Doc. 635, pgs. 97, 99-100, 116-18). At that time, Officer Bourbon was locating an "E ticket device" to issue Defendant a citation for the turn signal violation and then providing cover to Officer Hellmann at the rear of the vehicle. (Tr. at Doc. 635, pg. 100); (Defendant's Exhibit A, "Bourbon Body Camera," 8:47 to 11:27). That is, Debo was at the scene to conduct a "dog sniff" of the vehicle before the

officers issued a traffic citation or allayed the reasonable suspicion of insobriety. Even if this were not the case, though, the Court again notes that Officer Hellmann associated Defendant's failure to immediately stop his vehicle for the traffic stop with other drivers attempting to "hide contraband," giving rise to a reasonable suspicion of wrongdoing that justified the "dog sniff." *See Simon*, 397 F.3d at 831-32; *Lewis*, 920 F.3d at 491; (Tr. at Doc. 635, pgs. 82, 93-94, 97-98).

Immediately after the passengers were removed from the vehicle, which was an officer-safety process that yielded two firearms, Officer Yoder began the "dog sniff." (Tr. at Doc. 635, pgs. 101, 118); (Defendant's Exhibit A, "Hellmann Body Camera," 11:33, 12:58). That "dog sniff" lasted less than a minute. (Government's Exhibit 1, 8:00). Following Debo's alert to the vehicle, the Court **FINDS** Officer Hellmann had probable cause to search the entire vehicle, including the glove compartment that was unlocked with the keys found in the center console or cupholder. (Tr. at Doc. 635, pgs. 102, 118-19); (Government's Exhibit 1, 8:00 to 8:46).

The Court notes that Officer Yoder was required to pass an interview process and attend eight weeks of full-time training before becoming a canine handler. (Tr. at Doc. 635, pgs. 114-15). Further, Debo had to participate in a minimum of 16 hours of training per month. (Tr. at Doc. 635, pg. 114). As a result, Debo was "an adequately trained and reliable dog" for purposes of establishing probable cause to search the entire vehicle, and it is inconsequential that no narcotics were ultimately found in the vehicle. *See Bentley*, 795 F.3d at 635;  *Franklin*, 547 F.3d at 735; *Simon*, 397 F.3d at 833-35

("[T]he mere absence of drugs in Simon's car does not undermine the probable cause to search it for drugs, provided there was probable cause in the first place.").

### III. Conclusion

For the foregoing reasons, Defendant's Motion is **DENIED**.

**SO ORDERED.**

Dated: December 22, 2022.

_____
DAVID W. DUGAN
United States District Judge