IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,    )
                             )
                Plaintiff,   )
                             )
vs.                          )
                             )
FRANK SMITH,                 )        Case No. 21-CR-30003-DWD
WARREN GRIFFIN,              )
ANTHONY DOBBINS,             )
SEAN CLEMON,                 )
DOMINQUE MAXWELL,            )
PERRY HARRIS, and            )
BARRY BOYCE,                 )
                             )
                Defendants.  )

<u>MEMORANDUM & ORDER</u>

Before the Court is Defendant Maxwell's Motion for Judgment of Acquittal or, in the Alternative, Motion for a New Trial ("Motion") (Doc. 958). The Motion is **DENIED**.

## I. Background

A grand jury in the Southern District of Illinois originally returned a 13-count Indictment (Doc. 1) against Defendant and six co-Defendants. A 13-count Superseding Indictment (Doc. 671) was subsequently returned against Defendant and four co-Defendants, alleging a racketeering conspiracy, related to the Gangster Disciples Organization, in violation of 18 U.S.C. § 1962(d) and 1963(a) (Count 1). (Doc. 671). Defendant was also charged with the murder in aid of racketeering of Leroy Allen under 18 U.S.C. § 1959(a)(1) and Section 2 (Count 2), as well as with the attempted murder in aid of racketeering of Dushawn Wharton under 18 U.S.C. § 1959(a)(5) and Section 2 (Count 5). As a result of the charges contained in Counts 2 and 5, Defendant was also

charged with the use of a firearm during and in relation to a crime of violence against Leroy Allen and Dushawn Wharton under 18 U.S.C. § 924(C)(1)(A) and Section 2 (Counts 3 & 6), as well as with the use of a firearm during and in relation to a crime of violence causing the death of Leroy Allen under 18 U.S.C. § 924(j)(1) and Section 2 (Count 4).[1] After 23 days of trial, a jury found Defendant guilty on each of these Counts. (Docs. 851 & 856).

## II. Legal Principles

Under Federal Rule of Criminal Procedure 29(c)(1), a defendant may move for a judgment of acquittal after the jury returns a guilty verdict. *See* Fed. R. Crim. P. 29(c)(1). Such a motion must be granted where "the 'evidence is insufficient to sustain a conviction.' " *See U.S. v. Jones*, 713 F.3d 336, 339-40 (7th Cir. 2013) (quoting Fed. R. Crim. P. 29(a), (c)); *accord U.S. v. Filer*, 56 F.4th 421, 425 (7th Cir. 2022). Depending on the strength of the government's evidence, the defendant may "face[] a 'nearly insurmountable hurdle.' " *See Jones*, 713 F.3d at 339 (quoting *U.S. v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997)); *accord Filer*, 56 F.4th at 425. The Court assesses whether the evidence, when viewed in the light most favorable to the government, could allow *any* rational jury to find the essential elements proven beyond a reasonable doubt. *See Jones*, 713 F.3d at 340 (quoting *Jackson v. Virginia*, 443 U.S. 307, 313-14 (1979); citing *U.S. v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009)). Deference to the jury's deliberations prevents an assessment of the quality of evidence, meaning the Court respects the jury's function to determine

_____

[1] The Government dismissed Counts 7-10 of the Superseding Indictment.

the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences. *See U.S. v. Elizondo*, 21 F.4th 453, 470 (7th Cir. 2021) (quoting *U.S. Godinez*, 7 4th 628, 638-39 (7th Cir. 2021)). As such, the Court will overturn the verdict only if the record contains no evidence, regardless of how it is weighed, for the jury to find guilt beyond a reasonable doubt. *See id.* at 470-71 (quoting *U.S. v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018)).

Further, in its discretion under Federal Rule of Criminal Procedure 33(a), the Court may vacate a judgment and grant a new trial "if the interest of justice so requires."[2] *See* Fed. R. Crim. P. 33(a); *U.S. v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). The Court may do so if the substantial rights of a defendant were jeopardized by errors or omissions at trial. *See Kuzniar*, 881 F.2d at 470 (citing *U.S. v. Simms*, 508 F. Supp. 1188, 1202 (W.D. La. 1980)). Since a jury verdict should not be overturned lightly, a Rule 33(a) motion should not be granted lightly and is instead reserved for the most extreme cases. *See U.S. v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017) (quoting *U.S. v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016)); *U.S. v. Morales*, 902 F.2d 604, 605 (7th Cir. 1990) (citing *U.S. v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989); *U.S. v. Martinez*, 763 F.2d 1297, 1312-13 (11th Cir. 1985)).

### III. Analysis

Defendant presents various arguments in the Motion. Those arguments are separately addressed below. The Government did not file a response to the Motion.

### A. Venue

---

[2] The Court notes, despite its caption, Defendant's Motion does not discuss the Rule 33 standard.

First, Defendant asserts the Court "made a substantial legal error" when it denied Defendant Boyce's pretrial Motion to Dismiss for Improper Venue (Doc. 456). (Doc. 958, pg. 2). Defendant Maxwell joined that Motion, but he did not present additional briefing on the matter (Doc. 578). At the hearing on the Motion, however, Defendant's attorney presented oral argument (Doc. 692). In a Memorandum & Order (Doc. 665), the Court denied the Motion, as a pretrial matter, finding "the Indictment, on its face, properly alleges venue in the Southern District of Illinois." (Doc. 665, pg. 13). To the extent Defendant is now challenging that pretrial ruling in the Motion, the Court adheres to its prior Memorandum & Order, as Defendant presents no new pretrial venue arguments.

However, Defendant also argues there was insufficient evidence admitted at trial to demonstrate that he was involved in a conspiracy in the Southern District of Illinois, as each overt act occurred in Missouri. (Doc. 958, pgs. 2-3). Defendant does so in an abbreviated fashion and without a discussion of any evidence. (Doc. 958, pg. 2). In its prior Memorandum & Order, the Court indicated, "[i]f Defendants believe the Government has not met its burden of proving venue by a preponderance of the evidence at trial, they may, consistent with Seventh Circuit authority, refile their motion and/or seek to submit the question of venue to the jury." (Doc. 665, pg. 13).

In the Seventh Circuit, a claim of improper venue is waived if the issue is apparent on the face of the indictment and the defendant does not object before the close of the government's case. *See U.S. v. Knox*, 540 F.3d 708, 713 (7th Cir. 2008) (quoting *U.S. v. Ringer*, 300 F.3d 788, 790 (7th Cir. 2002)); *accord U.S. v. Brandon*, 50 F.3d 464, 469 (7th Cir. 1995) ("If the claimed lack of venue is apparent on the face of the indictment, an objection

must be lodged before the close of the government's case."). If the indictment does not give notice of a possible venue issue and the government rests without proving the crimes occurred in the relevant district, however, the defendant may object to venue in a motion for judgment of acquittal. *See Knox*, 540 F.3d at 713 (quoting *Ringer*, 300 F.3d at 790).

Here, despite the Court's indication in its prior Memorandum & Order, Defendant did not refile a motion or otherwise object to venue at trial, as to argue the Government did not prove venue by a preponderance of the evidence. (Doc. 665, pg. 13). Likewise, Defendant did not seek to present the question of venue to the jury. (Doc. 665, pg. 13). Clearly, based on the pretrial motion that was joined by Defendant, he was on notice of the possible venue issue from the indictment. *See Knox*, 540 F.3d at 713; *Brandon*, 50 F.3d at 469. Therefore, the Court is inclined to find Defendant waived the issue for purposes of the instant Motion. *See Brandon*, 50 F.3d at 469 (finding venue argument was waived, where "[a]ll of the facts argued by the Defendant as creating venue in a district other than the Northern District of Indiana [we]re clearly evident on the face of the indictment").

Nevertheless, the Court finds Defendant's venue argument does not support a judgment of acquittal. As previously noted, the RICO statute does not contain a venue provision. (Doc. 665, pgs. 5-6). Therefore, the propriety of venue is determined by "the nature of the crime alleged and the location of the act or acts constituting it." *See U.S. v. Clark*, 728 F.3d 622, 623-24 (7th Cir. 2013) (quoting *U.S. v. Tingle*, 183 F.3d 719, 726 (7th Cir. 1999)). Also, a RICO conspiracy is a continuing offense that may be brought anywhere the conspiracy "was begun, continued, or completed." *See Smith v. U.S.*, 568 U.S. 106, 111 (2013); *U.S. v. Spraggins*, No. 19-cr-821, 2021 WL 4264418, *6 (N.D. Ill. Sept.

20, 2021) (quoting 18 U.S.C. § 3237(a)). Accordingly, venue is proper in any district where: (1) an overt act of the conspiracy occurred, even if there is no evidence that the defendant entered the district or the conspiracy was formed there; (2) an overt act was intended to have effect; or (3) overt acts of a co-conspirator were carried out, even if there is no evidence that the defendant entered the district or the conspiracy was formed there. *See U.S. v. Ochoa*, 229 F.3d 631, 636-37 (7th Cir. 2000); *U.S. v. Muhammad*, 502 F.3d 646, 647-47, 655 (7th Cir. 2007); *see also U.S. v. Brown*, 739 F.2d 1136, 1148 (7th Cir. 1984) ("So long as an overt act in furtherance of the conspiracy is intended to have an effect in the district where the case is finally brought, venue is proper."). In short, as previously noted by the Court, federal courts have generally found a RICO conspiracy may be prosecuted in any district where the enterprise conducted illegal activities. (Doc. 665, pg. 11).

Specific to Defendant, however, the Court notes the Government admitted evidence showing Defendant was involved in a fight/stabbing between Gangster Disciple members and rivals at an East St. Louis, Illinois, nightclub, which is contained within this District. *See, e.g.,* (Docs. 671, pg. 12; 907, pgs. 170-71; 911, pgs. 116-117; 914, pgs. 107-118, 128-136, 185-187, 195-198). Evidence was also admitted showing Defendant was present at a Gangster Disciple meeting in East St. Louis, Illinois. *See, e.g.,* (Docs. 671, pg. 11; 914, pgs. 241-247). For these reasons, under the above-stated authorities, the Court rejects Defendant's argument and the relief requested under Rule 29.

## B. Count 1 (The RICO Conspiracy)

Second, Defendant argues a judgment of acquittal is warranted under Rule 29 because the Government failed to present sufficient evidence that he conspired with

Gangster Disciples members to commit two acts of racketeering under Count 1. (Doc. 958, pg. 3). Defendant states no reasonable juror could find him guilty, beyond a reasonable doubt, of that conduct. (Doc. 958, pg. 3). Defendant breaks the argument down as follows.

### 1. No Agreement to Commit Racketeering Crimes

Defendant argues the Government was required to prove, beyond a reasonable doubt, he "knowingly agreed with others that someone within the Gangster Disciples 'enterprise' would commit two criminal predicate acts in furtherance of a conspiracy." (Doc. 958, pg. 4). Defendant suggests the Government's case was limited to circumstantial evidence of "disparate snippets of communications between Mr. Maxwell and alleged Gangster Disciple[s] members," such as telephone calls, text messages, and a video clip at a Gangster Disciples meeting. (Doc. 958, pg. 5). He also argues those communications contain "gossip, opinions, or news of the day" but no agreements to commit crimes. (Doc. 958, pg. 5). In relation to the evidence of Leroy Allen's murder, which included cell phone records and a gun seized from Defendant's vehicle, Defendant argues the shooting was done in self-defense and not in order to further the alleged conspiracy. (Doc. 958, pg. 6).

Now, over the course of the 23-day trial, the jury heard a great deal of evidence about the Gangster Disciples on a national and regional level. The jury, by virtue of the guilty verdicts on Count 1, found the Gangster Disciples is a criminal organization for purposes of RICO. The jury further found Defendant and his co-defendants were guilty of knowingly joining the Gangster Disciples and participating in its affairs through a pattern of racketeering activity, which included acts of drug trafficking, murder, attempted murder, conspiracy to commit murder, and witness tampering.

As such, a general overview of the evidence admitted as to the Gangster Disciples organization, and Defendant's position therein, is in order. The Gangster Disciples has a top-down organizational structure, with specific leadership positions, known as "positions of authority." The gang's positions of authority include: (1) chairman, the national leader of the Gangster Disciples (Larry Hoover); (2) board members, the highest-ranking national leaders beneath the chairman; (3) governors of governors or attorneys general, leaders over multi-state regions in the country; (4) governors or superintendents, the highest-ranking state-level leaders; and (5) assistant governors or assistant superintendents, the second-in-command of their states. Various members were also responsible for providing security for the organization and its members and leaders.

Within the Gangster Disciples, positions of authority are extremely important. Gang members are expected to respect the hierarchy, follow the chain of command, and maintain silence and secrecy.[3] There were various leadership disputes within the gang. As discussed below, the disputes often resulted in violent conflicts between factions.

Defendant was aligned with co-Defendants Smith, Griffin, and Clemon in the Gangster Disciples. Defendants Smith and Griffin were board members, meaning they had authority over Gangster Disciples members throughout the country. Initially, Defendants Clemon and Maxwell held leadership positions over Gangster Disciples in Cape Girardeau, Missouri, with Clemon being Maxwell's superior. After the Matthew's

---

[3]Evidence presented at trial established that "silence and secrecy" is one of the gang's rules – members were prohibited from sharing any information about the Gangster Disciples with non-members.

Park shooting, which is discussed immediately below, Defendants Clemon and Maxwell were promoted to governor and assistant governor of Missouri, respectively.

Evidence produced at trial established, as early as January 2017, there were disputes regarding the Gangster Disciples' positions of authority in Missouri. At the time, Deshawn Wharton was the governor of Missouri with Leroy Allen supporting him in a security roll. Defendants Smith and Griffin, who were Gangster Disciples board members, wanted Wharton removed from his position of authority. This fact was known to Defendant. In 2017, Griffin began discussing his plans to assassinate Wharton. And, in early 2018, Smith sent a message to Gangster Disciples members indicating, *inter alia*, Wharton was officially "off count" and should be treated as an enemy of the organization.

In March 2018, Griffin held a meeting at Starbucks with various Gangster Disciples members, including Defendant, to discuss Wharton's removal as the governor of Missouri. During the meeting, Griffin decided Christopher Blount, a Gangster Disciples member, would be temporarily appointed as governor of Missouri. Thereafter, Blount messaged certain Gangster Disciples in the region about a mandatory meeting on April 28, 2018. Invitees were not told that the meeting would be at Matthew's Park. Instead, they were directed to meet at a gas station near the park. This was done to enhance security and to ensure that invitees could locate the park, which was somewhat secluded.

On April 28, 2018, Gangster Disciples members began arriving at Matthews Park. Blount enlisted a member of the security team to search attendees using a metal detector. This was done to prevent attendees who were associated with Wharton from bringing a gun to the meeting. Other attendees, however, were allowed to bring guns.

Defendants Clemon and Maxwell, as well as two other Gangster Disciples members (Deandre Jenkins and Defendant Perry Harris), drove together to Matthew's Park. Defendant Clemon was the highest-ranking member in the group, so everyone understood that they were responsible for ensuring his safety. They arrived at the park around noon. About twenty to forty other Gangster Disciples members were present. After arriving at the park, Defendant Clemon briefly spoke with Blount regarding various positions of authority in Missouri. Clemon told Blount he wanted to replace anyone associated with Wharton. Blount did not think this was necessary, but Clemon insisted.

Shortly thereafter, a group of Gangster Disciples that included Dushawn Wharton and Leroy Allen arrived at the park. Wharton approached Defendant Clemon and began arguing with him regarding who was the rightful governor of Missouri. Defendant Maxwell joined in the argument, telling Wharton he was no longer the governor. He also said Defendant Clemon was now the governor of Missouri. As the argument continued, Defendant Maxwell asked Defendant Clemon if they should call Defendant Smith, which they proceeded to do on Defendant Maxwell's cell phone. Defendant Smith was placed on speaker phone. As Defendant Clemon held the phone, the testimony indicated Defendant Smith gave the order for a "Mike Tyson punchout." Records also showed he sent a text to this effect to Defendant Maxwell's phone. In the Gangster Disciples, that was understood to be a directive for extreme violence, such as a stabbing or shooting.

After hearing Defendant Smith's order, Leroy Allen said he was not "feeling" this. Wharton, Allen, and their associates attempted to leave the park, but individuals aligned with Defendants Clemon and Maxwell continued to verbally confront them. Allen said

they would return when everyone calmed down, and he turned to leave a second time. As Allen and Wharton were walking away, Defendant Maxwell ran up behind Wharton and punched him in the back of the head. Individuals on both sides of the dispute, including Defendants Clemon and Maxwell, drew their guns and began shouting. Wharton nodded to an individual in his group, Gary Johnson. Johnson took cover behind a tree and began firing at Defendant Harris. Individuals on both sides of the dispute then began shooting. Over 70 shots were fired. Leroy Allen was killed, and Deshawn Wharton, who was wearing a bullet-proof vest, was seriously wounded as a result of the gunfire.

Witness testimony and ballistic evidence indicated Leroy Allen was shot while he was running from the scene and that the fatal bullet came from Defendant Maxwell's gun. As Defendant Maxwell notes in the Motion, the gun was seized following a traffic stop. There was no evidence that Allen was armed during the confrontation. Testimony from Perry Harris established, after the shooting, Defendant Maxwell told Harris and others that he "permanently" put someone "to sleep." Defendant Clemon told Harris that he fired on Wharton and observed bullets from his gun bouncing off Wharton's bullet-proof vest. Defendant Clemon indicated that his gun was "a piece of shit," and that if knew things were going to go down the way they did, he would have shot Wharton in the head. Further, approximately one hour after the shootout, a text message was sent from Defendant Maxwell's cell phone to Defendant Smith's cell phone that said, "done." Defendant Smith then instructed Defendant Maxwell to contact Defendant Griffin. After the shooting, Defendant Clemon was promoted to the position of governor of Missouri, and Defendant Maxwell was promoted to the position of assistant governor of Missouri.

Now, § 1962(d)'s target is the *agreement* to violate the RICO statute's substantive provisions as opposed to the actual violations themselves. *See Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 731 (7th Cir. 1998) (quoting *Schiffels v. Kemper Fin. Servs., Inc.*, 978 F.2d 344, 348 (7th Cir. 1992)); *accord U.S. v. Tello*, 687 F.3d 785, 792 (7th Cir. 2012) (stating Section 1962(d) "punishes the agreement to commit such an offense"). That is, such a charge does not require proof that the defendant actually committed two predicate acts of racketeering. *See Tello*, 687 F.3d at 792 (citing *Salinas v. U.S.*, 522 U.S. 52, 65-66 (1997)). Indeed, the acts need not be committed at all. *See id*. Further, an individual may be charged "even if he does not *agree to commit personally* the two predicate acts." *See Goren*, 156 F.3d at 731 (citing *U.S. v. Neapolitan*, 791 F.2d 489, 498 (7th 1986) (Emphasis added)). Finally, an individual need not agree two or more *specific* acts will be committed. *See U.S. v. Briseno*, 843 F.3d 264, 274-75 (7th Cir. 2016) ("[A]greeing that members of a gang will engage in extortion in a certain general area, during a certain time frame, and of a certain scope constitutes a general agreement to act, despite a lack of knowledge or agreement as to the precise dates, locations, and individuals that the extortion will involve.").

Here, the evidence was sufficient to indicate Defendant agreed that members of the conspiracy, including himself, would commit two acts of racketeering. Most notable, as Defendant's argument suggests, are the above-described events at Matthew's Park, where Defendants Smith, Clemon, and Maxwell agreed to a "Mike Tyson punchout."

Indeed, the events at Matthew's Park reveal multiple agreed-to acts of racketeering involving murder. Even before that time, though, the evidence indicates Defendants Smith, Griffin, Clemon, Maxwell, Harris, and other gang members entered a conspiracy

to remove Dushawn Wharton, and anyone aligned with him, from positions of authority at any cost. Then, at Matthew's Park, Defendants Clemon and Maxwell were involved in an argument with Dushawn Wharton and Leroy Allen about the rightful governor of Missouri. Defendants Clemon and Maxwell contacted their superior, Defendant Smith, who directed a "Mike Tyson punchout." The evidence indicates that directive was received by Defendants Clemon and Maxwell on Defendant Maxwell's speakerphone, as well as by Defendant Maxwell in a separate text from Defendant Smith. Defendants Clemon and Maxwell showed their agreement with that directive, and with the acts of each other, by simultaneously participating in the ensuing shootout with the rivaling faction of the gang. That shootout resulted in serious injuries to Dushawn Wharton, which the jury found constituted attempted murder in Count 5, and the death of his security officer, Leroy Allen, which the jury found constituted murder in Count 2. After the more than 70 shots were fired, Defendant Maxwell further evidenced his agreement with Defendant Smith's directive by texting him "done." Defendant Smith then instructed Defendant Maxwell to contact Defendant Griffin. Similarly, Defendant Clemon indicated to Defendant Harris that he fired on Wharton, his gun was "a piece of shit," and he should have shot Dushawn Wharton in the head. Both Defendants Clemon and Maxwell were promoted within the gang after these events. This evidence, at a minimum, would allow a rational jury to find the agreement contemplated by § 1962(d).

However, the evidence was also sufficient for a rational jury to find Defendant demonstrated that agreement in many other respects, including as to the shooting of

Corey Wade in Cape Girardeau, the "Mike Tyson punchout" of Kyle Wade, the erasure of Jimmy Miller a/k/a "JD," and the trafficking of drugs into the Missouri prison system.

## 2. "Enterprise vs. Conspiracy"

Defendant argues a RICO enterprise may include "legitimate entities and[] groups of individuals associated as de facto illegal enterprises." (Doc. 958, pgs. 6-7). He submits the Government cannot conflate proof required to prove an enterprise with that required to prove a conspiracy. (Doc. 958, pg. 7). That is, the Government cannot rely on proof of a RICO enterprise to prove his membership in a RICO conspiracy. (Doc. 958, pgs. 7-8). Defendant states, "many persons associated with the Gangster Disciples…are associated with the group for solely legitimate and charitable purposes." (Doc. 958, pg. 8).

Here, Defendant is correct that "the broad construction of the RICO conspiracy provision should not be used by the courts 'to criminalize mere association with an enterprise.' " *See Goren*, 156 F.3d at 731 (quoting *Neapolitan*, 791 F.2d at 498). However, as discussed in Section III.B.1, the evidence established that Defendant's conduct went far beyond any mere association with the Gangster Disciples. In rejecting Defendant's arguments to the contrary here, the Court adheres to its prior findings in that Section.

## 3. The Special Sentencing Factor—the Murder of Leroy Allen

Special Sentencing Factor 1, to which the jury answered "yes," provided: "If you find the defendant, Dominique Maxwell, guilty of Count 1, do you find that the defendant knowingly caused the death of Leroy Allen or with the purpose of causing serious physical injury to another person caused the death of Leroy Allen?" (Doc. 856, pg. 9). Notably, the Court has already rejected Defendant's other specific challenges to

Count 1. However, he now argues, without citing any legal authority, the Government failed to present sufficient evidence to submit that special sentencing factor to the jury. (Doc. 958, pg. 8). Defendant submits that there was insufficient evidence from which a reasonable juror could find, beyond a reasonable doubt, Defendant killed Leroy Allen, as the evidence showed "any gun play by Mr. Maxwell was done in self-defense." (Doc. 958, pg. 8). Indeed, Defendant states there was only evidence of self-defense. (Doc. 958, pg. 8).

Here, the Court emphasizes that it has already rejected Defendant's other specific challenges to Count 1. His present argument as to Count 1 and Special Sentencing Factor 1 is also at odds with the evidence of record, as discussed above, and the proper role of the jury. The jury heard the evidence, including as it was framed in the self-defense argument, then was instructed on self-defense by the Court. Defendant does not challenge that jury instruction. Clearly, based on the evidence, it was proper to submit Special Sentencing Factor 1 to the jury. The Court declines to accept the invitation, in a motion under Rule 29, to invade the province of the jury and to view the evidence more favorably for Defendant. *See United States v. Armbruster*, 48 F.4th 527, 535 (7th Cir. 2022).

For the reasons explained above, the Court rejects the arguments summarized in Section III.B.1, 2, and 3, as well as the relief requested by Defendant under Rule 29.

### C. Count 2 (Murder in Aid of Racketeering)

Third, Defendant argues there was insufficient evidence he committed or aided and abetted the murder of Allen. Defendant incorporates the arguments summarized in Section III.B.3. Defendant adds that there was insufficient evidence to prove the murder was for the purpose of maintaining or increasing his position within the Gangster

Disciples. (Doc. 958, pg. 9). Defendant states, "there is no evidence whatsoever that Mr. Allen's death maintained or increased [his] position within the Gangster Disciples as he was already Assistant Governor at the time of the shooting." (Doc. 958, pg. 9).

Here, again, Defendant minimizes the evidence, which is more fully described in Section III.B.1. In short, the witness testimony and ballistic evidence indicated Defendant Maxwell fatally shot Leroy Allen at Matthew's Park. Immediately before the shooting, Defendant Maxwell participated in a call with two of his Gangster Disciples superiors, namely, Defendants Smith and Clemon. The call occurred on speakerphone, and Defendant Smith ordered a "Mike Tyson punchout." That directive was also conveyed to Defendant Maxwell via text message. The shooting ensued and Leroy Allen was killed. Thereafter, Defendant Maxwell text Defendant Smith "done." Defendant Maxwell was then instructed by Defendant Smith to contact Defendant Griffin, who was another Gangster Disciples superior. Defendant Maxwell also subsequently told Defendant Harris and others that he "permanently" put someone "to sleep." As noted above, it is not for the Court to second guess the jury's consideration of the evidence. *See Armbruster*, 48 F.4th at 535. Likewise, it is not for the Court to question the jury's rejection of Defendant's arguments, including those related to self-defense. And, in light of the evidence, the Court emphasizes this is not a case where a new trial is warranted under Rule 33.[4] Put simply, the evidence was sufficient for a rational jury to find, beyond a reasonable doubt, Defendant committed or aided and abetted the murder of Leroy Allen.

---

[4]With respect to this argument, as opposed to his other arguments, it is unclear whether Defendant is seeking a judgment of acquittal under Rule 29 or a new trial under Rule 33.

The same is true with respect to the evidence that Defendant committed the murder of Leroy Allen to increase *or* maintain his position within the Gangster Disciples. This motive requirement is met "if the jury could properly infer that 'the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.' " *See U.S. v. DeSilva*, 505 F.3d 711, 715 (7th Cir. 2007) (quoting *U.S. v. Carson*, 455 F.3d 336, 369 (D.C. Cir. 2006)). Here, the evidence detailed the hierarchical structure of the Gangster Disciples. Members of that enterprise were required to follow orders of higher-ranking members and were expected to respond to any threats to their authority. The evidence established that Defendants Smith and Griffin, who were board members that outranked Defendant Maxwell, wanted Dushawn Wharton removed as the governor of Missouri. Defendant Griffin discussed the desire to assassinate Wharton, and Defendant Smith notified members that he was "off count" and an enemy of the organization. Defendant Griffin also held the Starbucks meeting, attended by Defendant Maxwell, to discuss Wharton's removal as governor of Missouri and his replacement.

At Matthew's Park, Defendant Maxwell joined an argument between Defendant Clemon, who was his superior, and Dushawn Wharton, about the rightful governor of Missouri. Dushawn Wharton and Leroy Allen insisted that, despite any directives from Defendants Griffin and Smith, Wharton remained the governor of Missouri. In light of the above-described evidence, a reasonable juror could conclude that Defendant Maxwell viewed these actions as a direct threat to or challenge to the authority of his superiors, namely, Defendants Smith, Griffin, and Clemon. Again, by this time, Defendants Smith

and Griffin issued orders relating to Dushawn Wharton and his status as governor of Missouri. Further, given his position within the Gangster Disciples, a reasonable juror could have found Defendant Maxwell was expected to respond to such a direct threat to or challenge to the authority of his superiors in order to increase *or* maintain his position within the gang. This is especially so where the evidence indicated Defendants Clemon and Maxwell called Defendant Smith, on Defendant Maxwell's speakerphone, at which time Defendant Smith ordered a "Mike Tyson punchout." Records indicated a text to that effect was also sent to Defendant Maxwell, to which he responded "done." As such, based on the evidence at trial, a reasonable juror could have concluded Defendant Maxwell was expected to follow such an order, which had an understood meaning within the Gangster Disciples. Finally, it is notable that, after the shooting, Defendant Maxwell reported back to Defendant Smith, texting him "done." He was also instructed to call Defendant Griffin.

For these reasons, the Court rejects Defendant's arguments and any relief requested under Rules 29 and 33.

### D. Tainted Jury Panel

Fourth, without citing to any legal authority, Defendant argues a new trial is warranted under Rule 33 because four members of the venire, ultimately selected as jurors, were "tainted by the actions of…Venire person 74." (Doc. 958, pg. 10).

During the *vior dire* of a panel of prospective jurors, venire member No. 74, while responding to standard *voir dire* questions, stated, "This organization, GDs, I've had two or three hits put out on me." (Doc. 901, p. 80). Venire member No. 74 did not make any additional statements. The Court immediately stopped questioning him, proceeded with

questioning of other venire members, and later *sua sponte* dismissed venire member No. 74. On a recess, outside the presence of the jury, Defendants moved to dismiss the panel of venire members that overheard the statement. The Court denied the motion, and when the remaining venire members returned, the Court questioned them about their ability to remain impartial, despite venire member No. 74's comment. All remaining members of the venire panel affirmed their ability to remain impartial on a jury.

Here, Defendant's argument is unspecific and fails to cite any legal authority. Further, Defendant does not point to any evidence that the jurors who ultimately sat on the jury were actually biased; his argument is purely speculative. Standing alone, Defendant's speculation does not warrant a new trial under the standards of Rule 33. Again, when questioned by the Court, the remaining potential jurors indicated that they could remain impartial, despite venire member No. 74's comment. Defendant gives no reason for the Court to discredit those responses. Therefore, the Court finds no evidence of bias. Defendant's argument is rejected and the relief requested under Rule 33 is denied. *See U.S. v. Hernandez*, 84 F.3d 931, 936 (7th Cir. 1996) (stating it is not an abuse of discretion to refuse to dismiss a venire panel when none of the potential jurors indicated their impartiality was affected by statements made during the *voir dire* process); *U.S. v. Moutry*, 46 F.3d 598, 603 (7th Cir. 1995) ("Absent any reasons [beyond speculation] to suspect as untrue the juror's claims of ability to remain impartial despite exposure to improper...comment, the court should credit those responses.").

### E. Plain Error Related to the Government's Rebuttal Argument

Fifth, Defendant presents an argument that, in its entirety, states: "Finally Defendant Maxwell asserts the Trial Court committed plain error when it gave the Government three (3) days to form a rebuttal to his closing." (Doc. 958, pg. 10). That argument is not otherwise explained or developed with citations to legal authority. Further, there is no discussion of the factual circumstances surrounding the rebuttal.

"[T]he Seventh Circuit has repeatedly clarified that underdeveloped and merely perfunctory arguments like this are waived." *See U.S. v. Morales*, 572 F. Supp. 3d 502, 508 (N.D. Ill. 2021) (citing *U.S. v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011); *U.S. v. Foster*, 652 F.3d 776, 793 (7th Cir. 2011); *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012)). Therefore, Defendant's argument is waived here. *See id.* (applying principle in the context of Rules 29 and 33, where many of the defendant's 21 arguments were presented in a single sentence and without citations to any supporting law or the court record); *U.S. v. Williams*, No. 18-cr-149-1, 2022 WL 1136573, *3 (N.D. Ill. April 18, 2022) (same); *U.S. v. Williams-Ogletree*, No. 11-cr-203-3, 2013 WL 647368, *3 (N.D. Ill. Feb. 21, 2013) (same).

Nevertheless, the Court briefly rejects the suggestion that it committed plain error in relation to the scheduling of the Government's rebuttal argument. Initially, due to the abbreviated nature of the present argument, Defendant has failed to carry the burden of establishing an adverse effect, *i.e.*, "serious prejudice," on his substantial rights. *See U.S. v. McGee*, 612 F.3d 627, 631 (7th Cir. 2010); *see also U.S. v. Garvey*, 688 F.3d 881, 885 (7th Cir. 2012) ("Plain error affects the substantial rights of a defendant when it is prejudicial, 'which means that there must be a reasonable probability that the error affected the

outcome of the trial.' [Citation].”). Again, Defendant has not attempted to show how his substantial rights were affected, in any way, by the factual circumstances surrounding the Government's rebuttal, let alone in a way that affected the outcome of the trial.

In any event, it is difficult to envision how Defendant could demonstrate plain error under the circumstances. Matters of trial management are within the district judge's discretion and are measured by a standard of reasonableness. *See U.S. v. Winbush*, 580 F.3d 503, 508 (7th Cir. 2009) (quoting *Brooks v. U.S.*, 64 F.3d 251, 256 (7th Cir. 1995)). Here, Defendant's attorney concluded the fifth and final closing argument on Thursday, March 2, 2023, at around 4:01 p.m. (Doc. 921, pgs. 1, 165-167). At that time, the Court noted “the Government is going to have rebuttal, I understand approximately an hour, maybe less, maybe more.” (Doc. 921, pg. 166). As was its usual practice throughout the 23 days of trial, the Court declined to keep the jury present in court past 4:30 p.m. or to require their attendance for trial on a Friday. The Court notes, during the lengthy trial, Friday was intentionally left open for other cases and any issues, arising unexpectedly in this case, that required the parties, but not the jury, to appear in court for hearings. *See Winbush*, 580 F.3d at 508 (noting the “great authority” possessed by district judges to manage their caseloads). The Government proceeded with its rebuttal at 8:40 a.m. on Monday, March 6, 2023. (Doc. 922, pgs. 1, 5). The Court finds these circumstances were reasonable.

## IV. Conclusion

For the foregoing reasons, Defendant's Motion is **DENIED**.

**SO ORDERED.**

Dated: July 17, 2023.

_____
DAVID W. DUGAN
United States District Judge